IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 6, 2004

## STATE OF TENNESSEE v. SHAWN EDWARD HAZELTINE

**Direct Appeal from the Circuit Court for Marshall County**
**No. 15272    Charles Lee, Judge**

_____

**No. M2003-01292-CCA-R3-CD - Filed May 17, 2004**

_____

A Marshall County jury convicted the Defendant, Shawn Edward Hazeltine, of three counts of aggravated assault and three counts of reckless endangerment. The trial court merged the reckless endangerment convictions with the aggravated assault convictions and then sentenced the Defendant to an aggregate seven years and seven months in prison. On appeal, the Defendant contends that: (1) insufficient evidence exists to support the convictions; (2) the trial court erred in not consolidating the three counts of reckless endangerment; and (3) the trial court erred by not ordering alternative sentencing and by ordering consecutive sentencing. We conclude that sufficient evidence exists in the record to support the Defendant's convictions and that the trial court did not err in sentencing the Defendant. However, we conclude that the trial court erred by failing to consolidate the three reckless endangerment convictions into one conviction. We further conclude that the trial court erred by entering a judgment form for Count 2 showing a conviction for reckless aggravated assault, because the trial court dismissed Count 2 of the indictment. Therefore, we remand the case to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part;**
**Reversed in Part; and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J. and ALAN E. GLENN, J., joined.

Hayley E. Fults, Shelbyville, Tennessee (on appeal) and Andrew Hoover, Pulaski, Tennessee (at trial) for the appellant, Shawn Edward Hazeltine.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William Michael McCown, District Attorney General; Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from an incident that occurred during the early morning hours of November 3, 2002, in the parking lot of a bar located in Marshall County. The Defendant, angry from altercations in the bar and the parking lot, drove his car toward the manager of the bar and another man and stopped shortly before hitting them. The Defendant then backed his car up, drove toward the men again and hit Martie Gottschalk, a designated driver who had just left the bar. A jury convicted the Defendant of three counts of aggravated assault and three counts of reckless endangerment. The trial court merged the reckless endangerment convictions with the aggravated assault convictions and then sentenced the Defendant to an aggregate seven years and seven months in prison. The Defendant now appeals.

## A. Trial

The following evidence was presented at the Defendant's trial. Keith Jolley, a deputy with the Marshall County Sheriff's Department, testified that he responded to a call to assist a person at Big Jim's Country, a bar located on Highway 50 in Marshall County, on November 3, 2002, at 2:11 a.m. Deputy Jolley stated that he saw a woman named Martie Gottschalk lying on the ground in the gravel parking lot of the bar, and then the paramedics arrived and took her to the hospital. He explained that he asked witnesses at the scene what had happened and learned that a car struck Gottschalk in the parking lot. The deputy testified that the Defendant's brother, Les Hazeltine, told him that the Defendant's car hit Gottschalk and then gave him a description of the car. The deputy confirmed that the car's license plate was registered to the Defendant. Deputy Jolley stated that he contacted his dispatcher and requested that an alert be put out for the Defendant's red Ford Escort.

Betty Prince, a bartender and cook at Big Jim's Country, testified that she tended the bar in the early morning hours of November 3, 2002, and stayed until closing. She testified that she observed the Defendant playing pool that evening. Betty Prince explained that, as she was cleaning up the bar at about 1:45 a.m., the Defendant threw a beer bottle at the bar cash register and it almost hit her. She reported that she immediately called for security to escort the Defendant out of the bar, stating, "Grab him. He threw a beer bottle." She explained that, after throwing the beer bottle, the Defendant walked swiftly toward the door of the bar because "[h]e want[ed] to get out of there." Betty Prince testified that her son, Jerry Prince, was the manager of the bar that night and he followed the Defendant out of the bar. She stated that she did not leave the bar area after calling for security and did not see what happened in the parking lot.

Kelly Clark, a bartender at Big Jim's Country, testified that she tended the bar with Betty Prince during the early morning hours of November 3, 2002. Clark stated that she served the Defendant a drink in the pool room, and he made a pass at her. She reported that she saw the Defendant throw a beer bottle toward the bar and then saw him walk toward the exit. She explained, "He hesitated going toward the door, looking back to see if the other two gentlemen that he had thrown the beer bottle at [were going] to take off after him . . . ." Clark testified that Jerry Prince followed the Defendant outside into the parking lot.

Jerry Prince, the manager of Big Jim's Country, testified that he supervised security during

the early morning hours of November 3, 2002. He explained that, as security at the bar, it was his duty to decide whether trouble-makers in the bar should leave the premises. He stated that he saw the Defendant near the bar earlier that evening but did not see the Defendant throw the beer bottle. Jerry Prince explained that, at around 2:00 a.m., he heard a beer bottle shatter, and then his mother, Betty Prince, pointed at the Defendant and yelled, "He threw something." He stated that he then saw the Defendant running out the front door. Jerry Prince testified that he ran after the Defendant and stopped him in the parking lot next to the bar. He testified that a group of men came out of the bar and into the parking lot with him, including Donnie Locke, Beau Schillig and Marty Parrish. He stated that he asked the Defendant why he threw the beer bottle, and the Defendant replied, "They called me a queer." Jerry Prince reported that he told the Defendant that he almost hit his mother, Betty Prince, with the beer bottle and then told him, "Get in your car and just leave." He stated that, after he told the Defendant to leave, the Defendant "got mad and . . . jumped in his car." Jerry Prince reported that the Defendant's car was a red Ford Escort. He explained, "After [the Defendant] got in the car, he started the car up, rolled the window down, and said, 'I will get you guys.'" Jerry Prince stated that the Defendant was looking at him and Schillig when he made that statement. He stated that he replied to the Defendant, "Just get out of here."

Jerry Prince testified that the Defendant then "[took] off spinning [his] tires, and [made] a big turn, spinning [his] tires." He explained that the Defendant "made a donut" in the parking lot and then accelerated toward him and Schillig. Jerry Prince testified that the Defendant's car was accelerating and throwing gravel as he drove toward them and then stopped a few inches away from Schillig and "about ten or fifteen feet" from him.

Jerry Prince explained that the Defendant then backed his car up about twenty-five feet and then "came at us again, spinning [his] tires." He stated that he and Schillig moved closer to the cars to be "a little safer." Jerry Prince explained, "When he started coming at us the second time, I saw [Schillig] coming off of the . . . left-hand . . . passenger side . . . . And then he kept on coming. And then I saw [Gottschalk]. I didn't know it was [Gottschalk] at first. I saw somebody coming off the hood of the car . . . ." He stated that the closest the Defendant's car came to him the second time was seven to ten feet because "I moved away from it, towards the line of cars that were parked." He said that both times the Defendant's car came toward him, he feared that he was going to be injured. Jerry Prince explained that, after the car passed him and Schillig, the Defendant's car traveled another ten to fifteen feet and he "saw somebody coming off of the hood." He said that the Defendant was looking straight ahead as he drove his car toward him and Schillig the second time. He stated that, after the Defendant hit Gottschalk, the Defendant stopped his car, backed up and started to drive away. Jerry Prince stated that he then ran after the car because "[the Defendant] just hit somebody in my parking lot." He testified that he attempted to open the passenger door to the Defendant's car, but the door was locked. He explained, "As the car started leaving, I kicked the [passenger] side of the car." He said that he kicked the Defendant's car to mark it "so they could find it later." He stated that the Defendant's car was "spinning gravel" when he left the parking lot. He said that he got a partial license plate number from the Defendant's car as it drove away.

Jerry Prince testified that, after the Defendant drove away, he checked on Gottschalk, who

was lying on the ground. He said that she was "screaming that her legs had been broke[n] . . . ." He stated that several people were assisting Gottschalk in the parking lot, including her brother and Schillig. Jerry Prince testified that he then called the ambulance and the police about the incident. He said that the police questioned him about the incident a few days later.

Beau Schillig testified that he arrived at his brother's engagement party at Big Jim's Country on the evening of November 2, 2002, at around 8:30 p.m. and stayed until bar closed the next morning. He stated that he saw the Defendant at the bar during the night, but he did not know him. Schillig said that, while he was playing pool in the early morning hours of November 3, 2002, he saw the Defendant pick up a beer bottle and throw it across the counter of the bar, hitting a neon sign and a cash register. He stated that the Defendant ran out the front door of the bar after he threw the beer bottle. He testified that he heard a lady at the bar yell, "Somebody threw a beer bottle," and then he saw Jerry Prince follow the Defendant out of the bar. Schillig testified that he went outside the bar to check on Jerry Prince and to see whether he needed assistance with the Defendant. He explained that he "[w]ent out there to help [Jerry Prince] calm the [Defendant] down." He said that he stood next to Jerry Prince as Prince asked the Defendant to leave, and the Defendant got into his car. Schillig stated that the Defendant "looked like he was going out [of the parking lot], and he ended up coming towards us." He reported that, as the Defendant came toward them in his car, "we tr[ied] to get out of the way." He said that the Defendant's car came within two inches of hitting him and he may have "scraped by it." Schillig testified that the Defendant was "[s]pinning [his] tires and acted like he wanted to hit us." He explained that the Defendant was "coming at us pretty fast," and he was concerned that he might get injured if the Defendant hit him with the car.

Schillig said that, after the Defendant stopped his car, he "put[] it in reverse and [took] off backwards" about ten feet. He stated that the Defendant then drove toward Jerry Prince and him again, with his tires spinning and "throwing gravel everywhere." He said that the Defendant's car came within two feet of him on the Defendant's second attempt to hit him, and he had to move out of the way to avoid getting hit. Schillig testified that he was scared that he would be injured if the Defendant hit him, so he jumped out of the way of the car. He stated that he heard Jerry Prince kick the Defendant's car as it was leaving the parking lot. Schillig stated that he did not see the Defendant's car hit Gottschalk, but after the Defendant sped off and left the parking lot he realized that she had been hit. He explained, "I got down there and was asking [Gottschalk] if she was okay, and just trying to get her to calm down. [I] [s]tayed over there with her until the ambulance got there." Schillig said that Gottschalk appeared to be in pain and was "yelling and screaming [that] her legs hurt." He explained that Gottschalk was his designated driver and was "going to [drive] me home."

Martie Gottschalk testified that she attended an engagement party for Schillig's brother at Big Jim's Country on the evening of November 2, 2002. She stated that she agreed to be the designated driver for Schillig because "he had been drinking a little bit and [Schillig's parents] didn't want him driving . . . ." She said that, during the early morning hours of November 3, 2002, "[t]here was a fight or confrontation inside. I was on the other side [of the bar]. And somebody said that [Schillig] had gotten thrown out." Gottschalk explained that she went outside to get Schillig

-4-

"because we had to [drive] him home." She testified, "I went out the front door and turned back to my left and went back toward the back [of the building]. Back there I could see there was a crowd . . . and I assumed it was [Schillig]. And I just went toward them to go get him." Gottschalk explained that she walked past two rows of cars and "then the next thing I know is I [saw] headlights." She said that the car was coming at her fast and she "didn't have time to think." She stated that she could not remember the car hitting her and realized that she was on the ground in the parking lot. She explained, "I must have blacked out because when I woke up, I was in the ambulance." She said that her right knee "was hurting pretty good. They told me that I had been hit." Gottschalk testified that, in addition to her knee, her stomach was sore from being hit by the car. She stated that the ambulance took her to the hospital for treatment. She explained that she had to wear a strap-on cast on her right leg for about three weeks and had to use crutches during that time. Gottschalk said that she no longer has any problems with her knee.

Ryan Derryberry, Gottschalk's older brother, testified that he attended the engagement party with Gottschalk at Big Jim's Country on the evening of November 2, 2002. He stated that he followed Gottschalk outside into the parking lot at around 2:00 a.m. on November 3, 2002, because "I knew there was some trouble starting." He explained that she was about fifty yards in front of him in the parking lot. Derryberry stated that he suddenly saw Gottschalk in the headlights of a car, and then the car hit her. He said that he caught a glimpse of a "reddish-maroonish car" backing up, and then ran directly to Gottschalk, who was lying in the parking lot. He explained that she was "on the ground, screaming in pain," so he held her and placed his sweater underneath her head. He said that he followed her to the hospital and then brought her home.

Marty Parrish testified that he was at Big Jim's Country during the early morning hours of November 3, 2002, and witnessed Gottschalk being hit by a car. He said that he went outside because he saw "everybody going toward the door, and I knew something was going on, so I went out there." He stated that, when the car hit her, she "went on the hood . . . [a]nd then he slammed on the brakes, and she fell off on the ground." Parrish said that, after hitting Gottschalk, the driver "put it in reverse and backed up and took off." He reported that the car that hit Gottschalk was a red Ford Escort. He stated that he wrote the license plate number on his hand and then gave it to the police when they arrived at the scene.

The Defendant testified that he arrived at Big Jim's Country at about 10:00 p.m. on November 2, 2002, with his brother and his brother's wife to celebrate their anniversary. He stated that he had about five or six beers over the course of the evening. The Defendant reported that, while he was sitting with his brother near the pool tables, a man playing pool said to the Defendant, "What are you, some kind of queer?" He explained, "I was kind of mad about it so I picked up a beer bottle. Yes, I did throw a beer bottle. . . . It was stupid of me to do [it]. I should have never [done] it. [I] [t]hen proceeded to run out of the bar." The Defendant stated that he ran out of the bar "because I knew I had made a bad mistake, and I was more than likely going to get in trouble for it, so I just wanted to leave." He testified that, as he ran out to his car, Jerry Prince was running after him. The Defendant said that he unlocked his car, got inside and then locked the car. He explained that Jerry Prince "was not a happy person. He was mad. I knew he was trying to come after me.

I didn't know at the time that the beer bottle had almost hit his mother, and I am very sorry for that. . . . I was just trying to get out of there." The Defendant explained that he could not understand what Jerry Prince was yelling at him in the parking lot. The Defendant said that he would have stayed at the bar and apologized for throwing the beer bottle if he had known that it almost hit Betty Prince.

The Defendant testified that, as he was backing up his car, Jerry Prince attempted to open his car doors on the driver's side and then on the passenger's side. The Defendant said that Jerry Prince kicked his car as he drove away. He explained, "I didn't see Ms. Gottschalk out there. . . . I did not hit [anybody]. If I did [hit somebody,] I would have stopped. I am not that kind of person. I would [not] have just . . . run somebody down and [then left] them there." The Defendant said, "If [Gottschalk] was hit by my vehicle, I never knew it. I had no idea. And that is why I just proceeded to leave." The Defendant testified that Jerry Prince stood in front of his car at one point, and he backed the car away from him in an attempt to leave. The Defendant denied using his car as a weapon against Jerry Prince and Schillig, stating, "I have never intentionally tried to run anybody down." He explained, "I just wanted to leave the bar, and I didn't want to get in [any] trouble. That is all I wanted to do." He denied "cutting donuts" in the parking lot because "if anybody knows anything about a front-wheel drive car, you cannot cut a donut in it. I wasn't sliding around." The Defendant also denied telling Jerry Prince, "I am going to get you." He stated that he kept his windows rolled up and did not say anything to Jerry Prince or anyone else.

The Defendant testified that, as he drove through the parking lot to leave, "I was kind of going a little bit fast, but I wasn't going that fast. I mean, I didn't have . . . the accelerator pushed all of the way down to the floor." He stated that he believed that he did not hit anybody that night. He explained, "I know [I] made a mistake throwing the beer bottle, but I did not knowingly and intentionally try to run somebody down out there in that parking lot, especially a woman. I wouldn't even raise my hand to a woman, much less try to run her down with a car."

On cross-examination, the Defendant admitted that he was convicted of aggravated burglary and theft on February 20, 1997. He denied hitting Gottschalk in the parking lot with his car. The Defendant stated that, at the bar, he "had a buzz," and he was mad at the two men at the pool tables because they called him a "queer," so he threw a beer bottle at them. The Defendant explained that he wanted to hit them with the beer bottle, and he admitted that he committed a crime by throwing the bottle at the men. He stated that he waited until he was on the other side of the bar to throw the beer bottle. The Defendant said that he did not try to run over Jerry Prince and Schillig and did not threaten them in any way. He stated that he was not "spinning gravel" as he left the parking lot. He testified that he looked out of the windshield as he drove his car forward in the parking lot and never saw Gottschalk.

Before submitting the case to the jury, the trial court dismissed Count 2 of the indictment, which charged the Defendant with aggravated assault for placing Gottschalk in reasonable fear of imminent bodily injury through the use or display of a deadly weapon. Thereafter, the jury convicted the Defendant of one count of reckless aggravated assault, a Class D felony, two counts of intentional or knowing aggravated assault, Class C felonies, and three counts of reckless

endangerment, Class E felonies.

## B. Sentencing Hearing

The following evidence was presented at the Defendant's sentencing hearing. The State introduced the Defendant's pre-sentence report into evidence. Jim Grimes, a supervisor in the probation and parole department for the State of Tennessee, testified that the Defendant had twelve prior misdemeanor convictions and one felony conviction in Giles County between 1994 and 1999. Grimes stated that the Defendant had been placed on probation approximately ten times during that time period, and the Defendant had a total of three revocation warrants "that were filed against him and sustained." He testified that the Defendant had failed to pay $2,598 in "balance dues" for his misdemeanor cases in Giles County. Grimes stated that the victim asked for $1,000 in restitution for her injuries. He testified that the Defendant had been convicted of assault on two previous occasions. Grimes said that the Defendant reported a history of drinking alcohol and using marijuana and crack cocaine. On cross-examination, Grimes stated that the victims in the Defendant's case showed little interest in the Defendant's sentencing. He testified that the Defendant expressed remorse for hitting Gottschalk in the parking lot.

James Edward Hazeltine, the Defendant's father, testified that the Defendant had an alcohol problem when he was younger. He stated that he put the Defendant in a rehabilitation center in Knoxville, and, when the Defendant returned home, "He was doing a lot better . . . ." James Hazeltine testified that the Defendant has lived with him for most of the Defendant's life. He said that the Defendant worked for Valley Packaging in Pulaski in November of 2002. He explained that the Defendant "was moving right along up the ladder there." James Hazeltine reported that the Defendant has not been convicted of any crimes from 1999 to the present. He testified that, if the trial court placed the Defendant on probation, the Defendant would reside at his house.

Tracy Mitchell, the Defendant's sister, testified that the Defendant "baby-sits for me any time I work during the weekends, when he is off work." She said that she has no hesitation about leaving her child alone with the Defendant. Les Hazeltine, the Defendant's brother, testified that the Defendant went to drug and alcohol rehabilitation and turned his life around. He explained, "It was night and day. I mean, when he got out [of rehabilitation], he got a good job. He had a steady job, worked hard every day . . . . and he was an upstanding citizen." Les Hazeltine said that, if the Defendant was placed on probation, he was certain that the Defendant would follow all of the requirements of probation. On cross-examination, he testified that he accompanied the Defendant to Big Jim's Country on November 2, 2002. Les Hazeltine stated that the Defendant was not drunk, but he had "a good buzz going" at the bar.

Following the presentation of this evidence, the trial court merged the three reckless endangerment convictions with the corresponding three aggravated assault convictions for each victim. The record shows that the trial court included an additional judgment form for Count 2, reckless aggravated assault, with the notation, "Merge with Count One," even though the trial court dismissed Count 2 before submitting the case to the jury.

After considering the evidence presented at the sentencing hearing, the trial court found the following enhancement factors to be applicable to the Defendant's convictions pursuant to Tennessee Code Annotated section 40-35-114 (1997 & Supp. 2002):

> (2) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; . . .
> (9) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; . . .[and]
> (17) The crime was committed under circumstances under which the potential for bodily injury to a victim was great. . . .

The trial court found that no mitigating factors applied to the Defendant's case. The trial court then determined that consecutive sentencing was appropriate under Tennessee Code Annotated section 40-35-115(b)(2) (1997 & Supp. 2002) because it found that the Defendant "is an offender whose record of criminal activity is extensive." Thereafter, the trial court imposed the following sentences: two years and nine months for reckless aggravated assault; and four years and ten months for each remaining conviction of aggravated assault, to be served concurrently with each other, but consecutively to the sentence for reckless aggravated assault. The trial court then denied the Defendant's request for alternative sentencing, finding that the Defendant was not a good candidate for alternative sentencing "because of the numerous times that the [D]efendant has been placed on probation . . . and the revocations which he suffered in the past." The trial court further found that alternative sentencing was not appropriate because of "the [D]efendant's past failures at rehabilitation, and apparently his present failure at rehabilitation." The Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) insufficient evidence exists to support his convictions; (2) the trial court erred in not consolidating the three counts of reckless endangerment; and (3) the trial court erred by not ordering alternative sentencing and by ordering consecutive sentencing.

### A. Sufficiency of the Evidence

First, the Defendant contends that the evidence presented at trial was insufficient to support his convictions for aggravated assault and reckless endangerment. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

-8-

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

### 1. Aggravated Assault

A person commits aggravated assault who:

(1) Intentionally or knowingly commits an assault as defined in § 39-13-101 and:
    (A) Causes serious bodily injury to another; or
    (B) Uses or displays a deadly weapon; or
(2) Recklessly commits an assault as defined in § 39-13-101(a)(1), and:
    (A) Causes serious bodily injury to another; or
    (B) Uses or displays a deadly weapon.

Tenn. Code Ann. § 39-13-102(a)(1), (2) (1997 & Supp. 2002). Tennessee Code Annotated section 39-13-101(a) (1997) states that a person commits assault who: "(1) Intentionally, knowingly or recklessly causes bodily injury to another; (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." "Deadly weapon" means "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(a)(5)(B) (1997). "Bodily injury" includes "a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2).

In this case, the Defendant was convicted for reckless aggravated assault for recklessly causing bodily injury to Gottschalk while using a deadly weapon. The Defendant also was convicted for two counts of aggravated assault for intentionally or knowingly causing Jerry Prince and Schillig to reasonably fear imminent bodily injury while using a deadly weapon. Viewing the evidence in the light most favorable to the prosecution, the proof showed that the Defendant got into his car in the parking lot and told Jerry Prince, "I will get you guys." The Defendant then "cut a donut" in the parking lot and then "spun gravel" as he accelerated toward Jerry Prince and Schillig. The Defendant's car stopped a few inches from Schillig, and then the Defendant backed his car up about

twenty-five feet in the parking lot. The Defendant then "spun gravel" again as he accelerated toward Jerry Prince and Schillig a second time. Jerry Prince and Schillig managed to dodge the Defendant's car, but the Defendant hit Gottschalk as she was crossing the parking lot, causing Gottschalk severe pain in her right leg and requiring her to wear a strap-on cast for about three weeks. Jerry Prince and Schillig testified that they feared bodily injury as the Defendant drove toward them on both occasions. The "deadly weapon" in this case was the Defendant's car, which was capable of causing death or serious bodily injury if it were to hit a person. Based upon this evidence, we conclude that a rational trier of fact could find beyond a reasonable doubt that the Defendant committed reckless aggravated assault against Gottschalk and aggravated assault against Jerry Prince and Schillig.

### 2. Reckless Endangerment

A person commits reckless endangerment "who recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a) (1997). Reckless endangerment committed with a deadly weapon is a Class E felony. Tenn. Code Ann. § 39-13-103(b). "Reckless" refers to a person "who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tenn. Code Ann. § 39-11-106(a)(31). The risk "must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Tenn. Code Ann. § 39-13-103(a)(31).

Viewed in the light most favorable to the prosecution, the evidence shows that the Defendant recklessly drove his vehicle at a high rate of speed in the parking lot of Big Jim's Country, thereby placing other people in the parking lot in imminent danger of death or serious bodily injury. The Defendant almost hit Jerry Prince and Schillig and struck Gottschalk during the course of his reckless driving in the parking lot. Thus, the evidence was sufficient for the jury to conclude beyond a reasonable doubt that the Defendant was guilty of recklessly endangering Gottschalk, Jerry Prince and Schillig. However, because of our holding with respect to the Defendant's second issue, we reverse the trial court's judgments for Counts 5 and 7 showing the convictions of reckless endangerment upon Jerry Prince and Schillig.

### B. Consolidation of Reckless Endangerment Convictions

The Defendant next contends that the trial court erred in not consolidating the three counts of reckless endangerment since they arose from the Defendant's single act of driving. The State concedes in its appellate brief that the Defendant's convictions for reckless endangerment upon Jerry Prince and Schillig must be merged into a single count, but the State argues that the conviction for reckless endangerment upon Gottschalk must stand. The State contends that the Defendant committed two separate acts of reckless endangerment in the parking lot because he drove toward Jerry Prince and Schillig, backed up and then drove at them again, hitting Gottschalk. We agree with the Defendant.

In State v. Ramsey, 903 S.W.2d 709, 713 (Tenn. Crim. App. 1995), this Court held that, in certain circumstances, a defendant's continuous operation of a vehicle may only result in one act of reckless endangerment under the statute. This Court noted that "the fact that the reckless endangerment statute speaks in terms of a person recklessly engaging in conduct indicates that a course of conduct, comprised of several acts, would constitute the offense." Ramsey, 903 S.W.2d at 713; see also State v. Davis, 654 S.W.2d 688, 696 (Tenn. Crim. App. 1983) (holding that if the statute prohibits a course of conduct, as opposed to individual acts, then there can be only one conviction even though several acts constituting the course of conduct may be proven). However, this Court declined to "fashion a blanket rule that provides that a defendant's continuous operation of a vehicle may *only* result in one act of reckless endangerment under the statute. Many scenarios could be created where such a rule would not be prudent." Ramsey, 903 S.W.2d at 713. Instead, the determination of whether the continuous operation of a vehicle may constitute one act of reckless endangerment depends upon the unique facts of each case. Id.

In Ramsey, the defendant was speeding in his car along a two lane road and veered into the oncoming lane, nearly hitting a pick-up truck traveling in that lane. Id. at 711. The defendant continued speeding and veered into the oncoming lane again, colliding with a second pick-up truck. Id. The defendant was convicted of three counts of reckless endangerment for three separate victims. Id. This Court determined that, under those facts, the trial court should have merged the three counts of reckless endangerment into one. This Court explained:

> Due to the very short distance between the two trucks and the very short amount of time that passed between swerving into the oncoming lane of traffic in front of the Tripletts and the crash with Mr. Story, the reckless conduct engaged in by the defendant was one continuous act, a single course of conduct, and therefore supports only one conviction for that act. In this case, . . . we find that although the defendant's reckless conduct victimized more than one person, it does not justify multiple convictions.

Id. at 713.

In this case, the evidence shows that the Defendant "cut a donut" in the parking lot and then "spun gravel" as he accelerated toward Jerry Prince and Schillig. The Defendant's car stopped a few inches from Schillig, and then the Defendant backed his car up about twenty-five feet in the parking lot. The Defendant then "spun gravel" again as he accelerated toward Jerry Prince and Schillig a second time. Jerry Prince and Schillig managed to dodge the Defendant's car, but the Defendant hit Gottschalk as she was crossing the parking lot. The facts of this case are similar to the facts in Ramsey because these events occurred during a very short period of time, and the victims were within close physical proximity of each other. We conclude that, under these facts, the reckless conduct engaged in by the Defendant was one continuous act, a single course of conduct, and, therefore, supports only one conviction for that act. Although the Defendant's reckless conduct victimized more than one person, we conclude that it does not justify multiple convictions. Accordingly, we reverse the trial court's judgments for Counts 5 and 7 showing the convictions of

-11-

reckless endangerment upon Jerry Prince and Schillig.

After thoroughly examining the record in this case, we also conclude that the trial court erred as to Count 2 by entering a judgment form for Count 2 showing a conviction for reckless aggravated assault with the notation, "Merge with Count One." Before the trial court submitted the case to the jury, the trial court dismissed Count 2 of the indictment. The jury convicted the Defendant of one count of reckless aggravated assault. Therefore, we remand the case to the trial court to enter an order vacating this extraneous judgment pertaining to Count 2.

### G. Sentencing

Finally, the Defendant contends that the trial court erred in sentencing the Defendant. The trial court imposed the following sentences: two years and nine months for reckless aggravated assault; and four years and ten months for each conviction of aggravated assault, to be served concurrently with each other, but consecutively to the sentence for reckless aggravated assault. Specifically, the Defendant argues that the trial court erred by imposing consecutive sentencing and denying his request for alternative sentencing. The State contends that the trial court did not abuse its discretion by ordering consecutive sentencing because the Defendant has an extensive history of criminal activity. The State also argues that the trial court properly denied the Defendant's request for alternative sentencing because the Defendant's probation has been revoked more than once in the past, and he has failed at his attempts to rehabilitate himself. We agree with the State.

When a defendant challenges the length and manner of service of a sentence, it is the duty of this court to conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001); State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.

A defendant is eligible for alternative sentencing if the sentence actually imposed is eight

years or less. Tenn. Code Ann. § 40-35-303(a) (2003). A defendant who is an especially mitigated or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(b)(6). In determining whether to grant or deny probation, the trial court may consider the following: the circumstances of the offense; the defendant's criminal record; background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The Defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169.

Tennessee Code Annotated section 40-35-103(1) (1997) states that:

Sentences involving confinement should be based on the following considerations: (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct; (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed. . . ." Tenn. Code Ann. § 40-35-103(5). The trial court may consider mitigating factors and enhancement factors when determining a defendant's sentence. Tenn. Code Ann. §§ 40-35-113, -114. A trial court may order sentences to run consecutively if a defendant is charged with more than one criminal offense and it finds, by a preponderance of the evidence, that one or more of several criteria are met as set forth in Tennessee Code Annotated section 40-35-115 (1997). State v. Kern, 909 S.W.2d 5, 8 (Tenn. Crim. App. 1993). These criteria include a finding by the trial court that the defendant is "an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(2). Whether sentences are to be served consecutively or concurrently is a matter within the sound discretion of the trial court. State v. James, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984).

In this case, after considering the evidence presented at the sentencing hearing, the trial court found the following enhancement factors to be applicable to the Defendant's convictions pursuant to Tennessee Code Annotated section 40-35-114:

(2) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; . . .
(9) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; . . .[and]
(17) The crime was committed under circumstances under which the potential for bodily injury to a victim was great; . . .

The trial court found that no mitigating factors applied to the Defendant's case. The trial court then determined that consecutive sentencing was appropriate under Tennessee Code Annotated section 40-35-115(b)(2) because it found that the Defendant "is an offender whose record of criminal activity is extensive." The trial court then denied the Defendant's request for alternative sentencing, finding that the Defendant was not a good candidate for alternative sentencing "because of the numerous times that the [D]efendant has been placed on probation . . . and the revocations which he suffered in the past." The trial court further found that alternative sentencing was not appropriate because of "the [D]efendant's past failures at rehabilitation, and apparently his present failure at rehabilitation."

On appeal, the Defendant does not contest the trial court's imposition of any enhancement factors;[1] rather he challenges the imposition of consecutive sentencing and the trial court's denial of the Defendant's request for alternative sentencing. After thoroughly reviewing the evidence presented at the sentencing hearing, we conclude that the trial court did not abuse its discretion by ordering consecutive sentencing in this case. The record shows that the Defendant is "an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(2). The Defendant's record shows the following convictions: evading arrest; leaving the scene of an accident; two convictions for disorderly conduct; two convictions for public intoxication; two convictions for vandalism; driving under the influence; two convictions for assault; aggravated burglary; and theft. These thirteen convictions demonstrate that the Defendant has an extensive record of criminal activity. Accordingly, we conclude that the trial court did not abuse its discretion by imposing consecutive sentencing in this case.

The Defendant next contends that the trial court erred by denying his request for alternative sentencing. The trial court found that the Defendant was not a good candidate for probation because of his prior probation revocations and his past failures at rehabilitation. The trial court noted that the Defendant "faltered considerably" in his rehabilitation on the night of the incident and "[t]hat almost caused at least one . . . person to be seriously, seriously injured, who [did not have a] dog in the fight, so to speak. She was just going to her car, and the [D]efendant recklessly ran over her because of this." We agree with the trial court's findings. The Defendant has been given the opportunity to rehabilitate himself under less restrictive means, and he has failed to take advantage

---

[1]In his appellate brief, the Defendant failed to argue any sentencing issues other than whether the trial court erred in ordering consecutive sentencing and in denying the Defendant's request for alternative sentencing. Accordingly, we conclude that the Defendant has waived any other sentencing issues. Tenn. R. App. P. 13(b); Tenn. R. Ct. Crim. App. 10(b). However, we note that the trial court erred by applying the enhancement factor that "the crime was committed under circumstances under which the potential for bodily injury to a victim was great." Tenn. Code Ann. § 40-35-114(17). In State v. Imfeld, 70 S.W.3d 698, 706 (Tenn. 2002), the Tennessee Supreme Court held that the "potential for bodily injury" enhancement factor was inapplicable to enhance the sentences for aggravated assault because "elements of an aggravated assault against a specific, named victim are reflected in the statutory language of the enhancement factor, thus rendering its application to enhance the sentence inappropriate." Even if we were to find that this issue was not waived, the trial court's error in applying this enhancement factor would not have resulted in a reduction in the Defendant's sentence because the trial court properly applied the two other enhancement factors.

of these opportunities. His actions in the parking lot of Big Jim's Country injured Gottschalk and could have seriously injured other people in the area. Moreover, the Defendant's extensive record of criminal activity indicates that he is not a good candidate for alternative sentencing. The record fully supports the trial court's findings and its determination denying the Defendant an alternative sentence. Therefore, we conclude that the Defendant has not met his burden of demonstrating the impropriety of the trial court's denial of alternative sentencing.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we AFFIRM the trial court's judgments for Counts 1, 4 and 6, the aggravated assault convictions, and for Count 3, the conviction of reckless endangerment upon Gottschalk. We REVERSE the trial court's judgments for Counts 5 and 7 showing the convictions of reckless endangerment upon Jerry Prince and Schillig. We REMAND the case to the trial court to enter an order vacating the extraneous judgment pertaining to Count 2 and for further proceedings consistent with this opinion.

_____

ROBERT W. WEDEMEYER, JUDGE